THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
13 May 2008

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

Trademark Trial and Appeal Board

————————

In re wTe Corporation

————————

Serial Nos. 78227268 and 78227272

————————

David Wolf of Wolf Greenfield & Sacks, P.C. for wTe Corporation.

Monique C. Miller, Trademark Examining Attorney, Law Office 109 (Dan Vavonese, Managing Attorney).

————————

Before Holtzman, Rogers, and Drost, Administrative Trademark Judges.

Opinion by Drost, Administrative Trademark Judge:

On March 19, 2003, applicant wTe Corporation filed two applications to register the mark SPECTRAMET in standard character form on the Principal Register for the following goods and services:

> No. 78227268 – Contract processing of metals using optoelectric and spectrographic sensors to rapidly identify and optionally sort metals and other materials by their chemical composition in Class 40.

> No. 78227272 – Optoelectronic apparatus for measuring and analyzing the composition of metal in Class 9.

Both applications were originally based on applicant's allegation of a bona fide intent to use the marks in

commerce.  After the marks were published for opposition,

applicant filed statements of use and provided the

following dates of use:

      No. 78227268
      First Use Anywhere – April 1994
      First Use in Commerce -  March 3, 2005

      No. 78227272
      First Use Anywhere – January 20, 2006
      First Use in Commerce -  January 20, 2006[1]

Refusals

      The examining attorney has refused registration in

both applications on the ground that "the specimen does not

match the drawing of the mark."  '268 and '272 Briefs at

11.[2]  The examining attorney has further explained that the

issue is whether "the drawing is a substantially exact

representation of the mark as used on or in connection with

the goods, as shown by the specimen.  37 C.F.R. § 2.51."

'272 Brief at 2.  *See also* '268 Brief at 2 ("whether

applicant's mark, as depicted on the drawing, matches the

mark show[n] on the specimen of use, as required under 37

---

[1] On July, 30, 2007, the board granted applicant's motion to consolidate these appeals.
[2] In the '272 application, the examining attorney also objected to the new evidence that applicant attached to its brief.  We sustain the objection and we will not consider evidence that has been submitted for the first time with applicant's brief.  37 CFR § 2.142(d).  *See also In re First Draft Inc.*, 76 USPQ2d 1183, 1192 (TTAB 2005) ("Submission of the TARR printout with its appeal brief, however, is an untimely submission of this evidence").

C.F.R. § 2.51; TMEP §§ 807.12-12(a)").  In the '268

application, the examining attorney has also refused

registration on the ground that "the specimen does not show

evidence of actual service mark use because it does not

show use of the mark in the sale or advertising of the

services."  '268 Brief at 1.

Drawings and Specimens

We begin by examining the specimens and drawings to

determine whether the mark shown in the drawing is a

substantially exact representation of the mark on

applicant's specimen.  The "drawing depicts the mark sought

to be registered."  37 CFR § 2.52.  "In an application

under section 1(b) of the Act, the drawing of the mark must

be a substantially exact representation of the mark as

intended to be used on or in connection with the goods

and/or services specified in the application, and once an

amendment to allege use under §2.76 or a statement of use

under §2.88 has been filed, the drawing of the mark must be

a substantially exact representation of the mark as used on

or in connection with the goods and/or services."  37 CFR

§ 2.51(b).  *See also In re Hacot-Columbier*, 105 F.3d 616,

41 USPQ2d 1523, 1525 (Fed. Cir. 1997) ("The regulation's

term 'substantially' permits some inconsequential variation

from the 'exact representation' standard").

The drawing in both applications is a standard character drawing showing the mark as SPECTRAMET. The specimens show the mark used as follows:

'268 Application                    '272 Application

 

The examining attorney argues that the marks on the specimens do not match the mark in the drawing for the following reasons:

> Applicant seeks to register the typed mark SPECTRAMET. In the specimen submitted with the statement of use on July 24, 2006, the applicant has replaced the letter "C" in the mark with an arrow design. The design consists of an arrow within an arrow in contrasting shades, in which the outer arrow is dark and surrounding the inner arrow in white. The inner arrow is the reverse of the outer arrow, and turns in to the outer arrow creating a design element that gives a general circular impression similar to the yin and yang symbol, and [is] clearly different from the letter "C" as applicant argues…
>
> Furthermore, because of the circular nature of the arrow design that is depicted on the specimen of use, the arrow design could be perceived as representing the letter "O," thereby creating a completely different commercial impression, SPEOTRAMET, from that

> of SPE**C**TRAMET, the applied for mark… Moreover, since the applicant's mark is a coined term, it is not obvious from viewing the context of the arrow design in the mark that it is necessarily representing the letter "C."

'272 Brief at 2-3. *See also* '268 Brief at unnumbered p. 3 (similar arguments).

Applicant responds by arguing that the "specimen submitted by applicant depicts the word, SPECTRAMET, in a slanted, block-style font. The letter 'C' has been stylized to appear as interlocking arrows, however such stylization conforms both in size and slant to the other letters comprising this word. This depiction of the letter 'C' therefore is not an independent design element, but a subtle modification of the chosen font style." '268 Reply Brief at 5.[3] Applicant also argues that "application for a standard character mark is made with the expectation that the applicant is merely claiming a generic form of the mark… [t]here is no corresponding requirement, however, that the commercial use of the mark should match the same generic, typed form." '268 Reply Brief at 6.

The TMEP sets out the following considerations for when a special form drawing is appropriate.

---

[3] Applicant's '272 Reply Brief (unnumbered p. 3) "relies upon the same arguments made in the copending Brief on Appeal relating to Application Serial No. 78/227268 as set forth under Argument Section III(A) from pages 2-6 inclusive."

> The USPTO encourages the use of standard character drawings. As a general rule, an applicant may submit a standard character drawing when the word, letter, numeral, or combination thereof creates a distinct commercial impression apart from any stylization or design element appearing on the specimen. If a mark remains the same in essence and is recognizable regardless of the form or manner of display that is presented, displaying the mark in standard character format affords a quick and efficient way of showing the essence of the mark.

TMEP § 807.04(b) (5th ed. September 2007).

We agree with applicant that when an applicant submits a standard character drawing it will often not be an "exact representation" of the mark as shown on the drawing because the very purpose of the typed or standard character drawing rule is to permit an applicant to apply for a mark without showing any particular style or design. The mere fact that there is a design element associated with the word in the mark does not prevent an applicant from using a typed or standard character drawing. For example in *In re Oroweat Baking Co.,* 171 USPQ 168 (TTAB 1971), the board held that the mark OROWEAT could be registered without a special form drawing even though the mark as used showed a design within the letters "O" as shown below:



In another case, the board reversed a refusal to register the term HY-LINE even though the specimens showed the words "HY-" and "LINE" separated by an "X" formed by drill bits (the applicant's goods). *In re Lear Siegler, Inc.*, 190 USPQ 317, 317-18 (TTAB 1976) ("'HY-LINE' is the only literal portion of the mark and therefore it is the part of the mark which will be used to order and distinguish the goods"). Finally, in a third case, even when the specimens showed two words sharing overlapping letters, the board permitted the registration of the term DUMPMASTER separately. *In re Dempster Brothers, Inc*., 132 USPQ 300 (TTAB 1961):

In the applications before us, we agree that the determination of whether a mark shown in the drawing is a substantially exact representation of the mark shown on the specimen is "assuredly a subjective one." *In re R.J. Reynolds Tobacco Co.*, 222 USPQ 552, 552 (TTAB 1984) (Applicant permitted to register BE MORE YOU even though the specimen showed use of the mark with hyphens). When a trademark is used in a stylized form, there is always a possibility that some purchasers may interpret the stylized letters differently. For example in the *Lear Siegler* case,

7

it certainly was possible that the mark could have been interpreted by some purchasers to be HY-X LINE rather than HY-LINE with a cross bit design in between the word portions of the mark. The mere possibility that one letter in applicant's mark may be perceived as an "O" or a "C" is not necessarily fatal to applicant's use of a standard character drawing. If this were the case, it would be difficult to use a standard character drawing whenever an uppercase letter "O" or the lowercase letter "l" is used because of their similarity to the numerals "0" (zero) and "1" (one).

Here, while it is not beyond the realm of possibility that some purchasers may, at least initially, wonder if applicant's mark is actually SPEOTRAMET, most would view the mark as applicant indicates, SPECTRAMET. Not only is "Spectr-" a more common beginning for a word in English (spectral, spectrographic, spectrogram, spectrometer, spectrophotometer, spectroscope, spectrum, etc.), but also the fourth letter, as used by applicant, simply looks more similar to a "C" than an "O." There would be little reason for consumers to view the mark as displayed on the specimen as anything other than SPECTRAMET. We add that the arrow design is not a very significant element and the mark in the drawing and the specimens remain "the same in essence."

8

The examining attorney's cases are distinguishable. In *In re United Services Life Insurance Co.*, 181 USPQ 655, 656 (TTAB 1973), the actual display of the mark was a critical factor in permitting the expression to function as a trademark:

> The commercial impression of a mark is engendered by the mark as a whole and, more often than not, by the particular display or arrangement of the components thereof. This is especially so in the present case because the words "FOR LIFE INSURANCE SEE US" in an ordinary display is nothing more than a trite impression that may be devoid of the capability of identifying and distinguishing the life insurance services of any one particular company. It is manifestly the enlargement of the letters "US" (the initial letters of the distinguishing words of applicant's corporate name) and the underlining thereof that bestows upon the mark the double entendre which enables it to function as an indication of origin to purchasers of life insurance and therefore removes it from the category of unregistrable marks and slogans.

In *In re Morton Norwich Products, Inc.*, 221 USPQ 1023, 1023 (TTAB 1983), the board affirmed the refusal to register the mark LABID because the actual display of the mark involved a lower case "a" with a diacritical accent mark, that set off the "BID" portion of applicant's mark and "the 'BID' portion of applicant's mark has an accepted meaning when applied as an abbreviation in drug prescriptions, i.e., twice a day." In applicant's case, the use of the interlocking arrows to form the fourth letter in applicant's mark does not result in any such

highlighting or emphasis of a particular element that has significance when considered on its own.

A mark cannot be shown as a typed or standard character drawing if it "is stylized or has a design element [that] engenders an uncommon or 'special' commercial impression that would be altered or lost were registration to issue based on a typed drawing." *Morton Norwich*, 221 USPQ at 1023. The board has discussed when a special form drawing is required and a typed drawing would, therefore, be inappropriate.

> In the particular instance it is our opinion that the adjective "special" must be given its ordinary meaning which would be "uncommon," "noteworthy," "extraordinary."

> As we view applicant's mark as used[,] the compound term "luncheon time" is presented in an uncommon manner to the extent that a prospective purchaser's initial impression of the mark might well be other than that which applicant may intend to convey by the well understood term "luncheon time."

*In re Dartmouth Marketing Co*., Inc., 154 USPQ 557, 558 (TTAB 1967) (parentheticals omitted).

In the present case, we cannot find that the display of applicant's mark is uncommon, noteworthy, or extraordinary. Applicant's mark, like many marks, contains a design, but the Office encourages applicants to submit drawings that depict their marks in standard character form. *See* TMEP § 807.04(b). Here, inasmuch as the term

SPECTRAMET creates a distinct commercial impression apart from any stylization or design element appearing on the '268 and '272 specimens, we reverse the examining attorney's refusals to register on the ground that the mark in the drawing is not a substantially exact representation of the mark as displayed on the specimens in these cases.

Service Mark Use in '268 Application

The examining attorney also refused registration in the '268 application on the ground that the specimens do not show actual service mark use, citing 15 U.S.C. §§ 1051-1053 and 1127 and 37 CFR §§ 2.56 and 2.76(b)(2). The examining attorney argues that the "specimen of record comprises a packaging label and is unacceptable as evidence of actual service mark use because it does not show use of the mark in the sale or advertising of the services, nor does the specimen create in the mind of the purchaser an association between the mark and the service activity." '268 Brief at 5.

In response, applicant argues that:

Although the specimen provided by Applicant is a packaging label in the sense that it is affixed to boxes being mailed to customers, this specimen and the information contained within it constitute an invoice of the service provided to the customer clearly displayed on the customer's final product… Accordingly, while the specimen offered may be referred to as a "label" it is also much more. The specimen offered by Applicant not only provides

sufficient information to create an association
between the SPECTRAMET mark and the service provided,
but use of this specimen in the manner chosen by
Applicant allows for easy identification of the
respective service with its source.

'268 Reply Brief at 11-12.

"The question whether the subject matter of an
application for registration functions as a mark is
determined by examining the specimens along with any other
relevant material submitted by applicant during prosecution
of the application."  *In re The Signal Companies, Inc.*, 228
USPQ 956, 957 (TTAB 1986).

An important function of specimens in a trademark
application is, manifestly, to enable the PTO to
verify the statements made in the application
regarding trademark use.  In this regard, the manner
in which an applicant has employed the asserted mark,
as evidenced by the specimens of record, must be
carefully considered in determining whether the
asserted mark has been used *as a trademark* with
respect to the goods named in the application.

*In re Bose Corp.*, 546 F.2d 893, 192 USPQ 213, 216 (CCPA
1976) (footnote omitted).

It is important that the specimens support use of the
mark in association with the services for which applicant
is seeking registration.  In another case involving
specimens consisting of labels, the board held that they
did not show use in association with custom manufacturing
services.  *In re Johnson Controls Inc.*, 33 USPQ2d 1318,
1320 (TTAB 1994) ("[T]he labels submitted as specimens with

this application do not show use of the mark sought to be registered as a service mark for the custom manufacture of valves. If the application sought registration as a trademark for these fluid control products, these specimens would clearly be satisfactory, but that is not the issue here"). *See also In re Adair*, 45 USPQ2d 1211 (TTAB 1997) (Mark TREE ARTS CO. and design may function as a mark for goods but specimen did not show the term used as a mark for the service of designing permanently decorated Christmas trees).

The CCPA has noted that:

> The requirement that a mark must be "used in the sale or advertising of services" to be registered as a service mark is clear and specific. We think it is not met by evidence which only shows use of the mark as the name of a process and that the company is in the business of rendering services generally, even though the advertising of the services appears in the same brochure in which the name of the process is used. The minimum requirement is some direct association between the offer of services and the mark sought to be registered therefor.

*In re Universal Oil Products Co.*, 476 F.2d 653, 177 USPQ 456, 457 (CCPA 1973).

In this case, applicant admits that it uses the mark as part of a return address on a "packaging label that is affixed to boxes being mailed to customers."



The CCPA has made it clear that there must be "some direct association between the offer of services and the mark sought to be registered." Applicant's return address on products that it already made and sold to the customer does not show a connection between the offer of contract processing of metals services and the mark.

Applicant relies on *In re Metriplex, Inc.*, 23 USPQ2d 1315 (TTAB 1992) as well as *In re Eagle Fence Rentals, Inc.*, 231 USPQ 228 (TTAB 1986) in support of its position. However, as the board subsequently pointed out:

> As was the case in *Metriplex*, there are situations in which the specimens do not contain a reference to the services, but yet are acceptable, since they show direct use of the mark in connection with the rendering of the services. Here we have no evidence of the rendering of the consultation services.

*In re Monograms America Inc.*, 51 USPQ2d 1317, 1319 n.2 (TTAB 1999).

Similarly, while the specimen may suggest that applicant is providing some type of goods or services, it is not at all clear from applicant's specimen as it was in *Metriplex* or *Eagle Fence* that it is providing the specific service for which it seeks registration. *See Monograms America Inc.*, 51 USPQ2d at 1319 ("While these notations

might be interpreted as an indication that this is an association or 'network' of 'embroidery stores,' there is no indication as to the purpose or activities of this association. There is no reference whatsoever to any type of consultation service, even in the area of monogramming per se, much less in the management of, or advertising for, the stores offering this monogramming").

Therefore, we conclude that applicant's specimen does not show actual service mark use of the mark SPECTRAMET for contract processing of metals using optoelectric and spectrographic sensors to rapidly identify and optionally sort metals and other materials by their chemical composition.

Decision: The refusals to register the marks in application Serial Nos. 78227268 and 78227272 on the ground that the mark on the drawing is not a substantially exact representation of the mark on the specimen are reversed. In Serial No. 78227268, the refusal to register on the ground that the specimen does not show actual service mark use is affirmed.